UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROSE SHUMOW, as Personal Representative of the Estate of MOSES SHUMOW, <br><br> *Plaintiff* <br><br> v. <br><br> KEOLIS COMMUTER SERVICES, LLC., MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATHAN DROWN, and CITY OF BEVERLY, <br><br> *Defendants* | CIVIL ACTION NO. |

## COMPLAINT

### I.   PRELIMINARY STATEMENT

1. This action is brought pursuant to the provisions of G.L. c. 229, § 2 seeking damages arising from the wrongful death of Moses Shumow ("Shumow") who was killed when struck by a train at the Beverly Depot train station in Beverly, Massachusetts ("Beverly Depot") on the Commuter Rail railway.

### II.   PARTIES

2. The plaintiff, Rose Shumow, is a resident of the State of Florida, and is the personal representative of the Estate of Moses Shumow.

3.   The defendant Keolis Commuter Services, LLC ("Keolis") is a corporation duly established under law with a principal place of business in Boston, County of Suffolk, Commonwealth of Massachusetts.

4.   The defendant, Massachusetts Bay Transportation Authority ("MBTA") is a body politic organized and created pursuant to G.L. c. 161A, and at all times relevant hereto has maintained a principal place of business located in Boston, County of Suffolk, Commonwealth of Massachusetts.

5.   The defendant Nathan Drown ("Drown") is a resident of the State of New Hampshire.

6.   The defendant, City of Beverly, is a municipality duly incorporated under the laws of the Commonwealth of Massachusetts.

### III.   <u>JURISDICTION</u>

7.   Jurisdiction is established by 42 U.S.C. §§ 1331 as this case involves the interpretation of the Code of Federal Regulations.  Jurisdiction is also established by 28 U.S.C. § 1332, as the amount of controversy exceeds $75,000.  Pursuant to 28 U.S.C. § 1367, Plaintiff invokes the supplemental jurisdiction of this Court to hear state tort claims.

### IV.   <u>FACTS</u>

8.   On October 22, 2019, at approximately 8:15 AM, Shumow was riding his bicycle to the Beverly Depot to catch the westbound/inbound train when he was struck and killed by an MBTA Commuter Rail Train while in the pedestrian grade crossing.

9.   The location of the collision has been identified as Track #1, U.S. DOT Grade Crossing ID No. 926105Y.

10.  The train was identified as Locomotive Engine #2015 of MBTA Commuter Rail, Train #155, which is owned by the MBTA and operated by Keolis.

11.   Train #155 was operated by Drown, an agent of Keolis and MBTA.

12.   Train #155 was traveling eastbound/outbound in excess of the applicable speed limit at that portion of the track, as established by the Northeast Operating Rules ("NORAC").

13.   The MBTA controls and maintains the Beverly Depot along with the platforms, pedestrian grade crossings, walkways, the train tracks, and the signage posted at the Beverly Depot.

14.   Keolis operates and maintains the commuter rail trains passing through the Beverly Depot.

15.   The pedestrian grade crossings at the Beverly Depot pass over two railways, directly in the path of oncoming trains.

### a.   The Incident

16.   Prior to the collision, Shumow was riding his bicycle through the parking lot at the Beverly Depot, traveling toward the pedestrian grade crossings at the Beverly Depot.

17.   As Shumow approached the station, he traveled up a ramp onto the sidewalk that runs parallel with the train tracks.

18.   Shumow took a right turn on to the sidewalk and travelled along the sidewalk with his back toward the train, in the direction of the pedestrian grade crossing.

19.   Shumow then took a left turn onto the pedestrian grade crossing and was immediately struck by train #155.

20.   A group of pedestrians and a dog preceded Shumow into Crossing No. 926105Y approximately ten (10) seconds before the collision.

21.   Shumow approached the same crossing four (4) seconds after they cleared the crossing.

22.   Shumow was never alerted to the existence of the train, i.e., there was no train horn, and there were no signals or alerts at the Beverly Depot that coincided with the arrival of the train to warn pedestrians of the oncoming train.

23. Shumow first became aware of the train when he was on the tracks, directly in front of the train.

24. At the Beverly Depot, pedestrians are permitted to cross in front of the oncoming trains, which causes a dangerous condition to exist at the Beverly Depot.

   **b.  Prior Accidents**

25. Numerous pedestrians have been struck by trains at the Beverly Depot in the ten (10) years prior to this incident.

26. On May 13, 2010, Linda Evans was struck by a train at the Beverly Depot.

27. On November 15, 2013, a 51-year-old man was struck by a train at the Beverly Depot.

28. On September 22, 2014, a woman was struck by a train at the Beverly Depot while trying to cross in front of the train.

29. On July 7, 2017, a man sustained injuries from a glancing blow from a train at the Beverly Depot.

30. On September 1, 2017, Thomas O'Reilly was struck by a train and killed at the Beverly Depot.

31. In fact, there have been numerous other injuries and fatalities involving pedestrians being struck by trains within the City of Beverly.

32. On October 27, 1999, 17-year-old Andrew Cesa was struck by a train and killed at Cabot Street near Kittridge Crossing in Beverly while walking on the train tracks.

33. On October 13, 2004, 14-year-old David Siljeholm was struck by a train and killed while riding his bicycle at Hale and West Streets in Beverly.

34. In 2004, a woman was struck by a train on Dodge Street in Beverly.

35. On October 2, 2013, Asaki Nishiyama, a student at Endicott College, was struck and killed at

Prides Crossing in Beverly.

36. On March 20, 2015, a 21-year-old was struck by a train and killed at Prides Crossing in Beverly.

37. On June 17, 2015, a 52-year-old was struck by a train while on the tracks at Congress and Wellman Streets in Beverly.

38. On March 17, 2019, a man was struck by a train and killed at Essex Street, near Monserrat Station, in Beverly.

### c. Standard of Care for Pedestrian Grade Crossings

39. In 2012, the FRA established "Guidelines on Pedestrian Crossing Safety at or Near Passenger Stations."

40. This publication provided strategies and methods to railroad operators and state and local governments to prevent pedestrian accident, incidents, injuries, and fatalities at or near passenger stations.

41. The guidelines included well documented and established infrastructure steps and processes needed to ensure pedestrian crossing safety at train stations including:

   (1) providing audible and visual warning of approaching trains to the pedestrians at railroad passenger stations including the sounding of the locomotive bell on approach and while moving through passenger stations and an audible warning consisting of announcements that specify train arrival track, eventual train destination, supplemented by a display of the text of the announcement on a changeable message sign using a light-emitting diode display or other high-legibility technology distinctive enough to attract attention in what may be a very busy and noisy environment;

(2)    using signs, signals, or other visual devices to warn pedestrians of approaching trains, including bells, lights, pavement markings, and crossbucks;

(3)    installing infrastructure at pedestrian crossings to improve the safety of pedestrians crossing railroad tracks, including gates, channelization and fencing to prohibit access to railroad tracks.

(4)    sounding the horn in combination with the bell on approach and while moving through passenger stations.

42.    These guidelines represent the standard of care regarding the safety of pedestrian grade crossings in the railroad industry.

43.    It is Keolis' policy and custom to sound the horn when entering passenger stations unless precluded from doing so by state or federal law.

44.    Despite the substantial risk of injury to pedestrians, the Beverly Depot was not equipped with automatic gates, warning lights, buzzers, signs, signals, signalmen or flagmen, gates, crossbucks, pavement markings or other safety devices to warn pedestrians of the approaching trains, or any way to allow pedestrians to cross the tracks safely in violation of the standard of care in the railroad industry.

### d.  Horn Requirements

45.    Both state and federal laws require trains to sound their horn or whistle upon entering grade crossings.  See 49 C.F.R. § 222.21 (horn required 15-20 seconds before crossing) and G.L. c. 160, § 138 (horn required no later than 1320 feet before crossing). See *Boyd v. National R.R. Passenger Corp.*, 446 Mass. 540 (2006).

46.    Both state and federal laws require trains to sound their horn or whistle upon entering pedestrian grade crossings.  49 C.F.R. § 222.27; G.L. c. 160, § 138.

47. Drown did not sound the horn using two long blasts, one short blast and one long blast, 15-20 seconds before entering the Beverly Depot, as required by 49 C.F.R. § 222.21.

48. Drown did not sound three separate and distinct horn blasts 1320 feet before the Beverly Depot before the crossing, as required by G.L. c. 160, § 138.

49. The established standard of safety procedures in the railroad industry requires train engineers to immediately blow the horn whenever a person is on the tracks and/or in the engineer's judgment, poses a risk of imminent serious injury or death.

50. Drown did not sound the horn as required by established safety procedures in the railroad industry when he observed several pedestrians and a dog walk across the tracks moments before Shumow entered the crossing.

51. Had Drown sounded the horn as required by state and federal laws as well as the established safety procedures in the railroad industry, Shumow would have recognized and perceived that a train approach was imminent, and he would have avoided the crossing at the moment he did and would not have been struck and killed by the train.

52. The laws requiring horn blasts were made in recognition of the well-known fact that the absence of train horns dramatically increases the number of collisions at grade crossings.

53. Prior to this incident, numerous public and private officials had warned the City of Beverly that horn bans are dangerous to the health and safety of the public.

54. At all times material to this action, the City of Beverly knew or should have known of the importance of maintaining safety at all grade crossings as Beverly has more grade crossings than any other municipality in Massachusetts.

55. Nevertheless, the City of Beverly banned, and continues to ban, the use of train horns within the city limits, as the mayor was a vocal critic of train horns and whistles within the limits of the City of Beverly.

### e. Beverly's Purported "Quiet Zone"

56. The City of Beverly has purportedly exempted itself from the law requiring train horns by claiming to apply for "Quiet Zone" status with the Department of Telecommunications and Energy ("DTE") pursuant to G.L. c. 160, § 139.

57. In July 2004, the Massachusetts Municipal Association ("MMA") on behalf of the City of Beverly and other municipalities, filed a petition with the DTE requesting permission to maintain train whistle bans for certain crossings located within those municipalities.

58. In 2005, the Federal Railroad Administration ("FRA") established regulations regarding the approval of Quiet Zones, that is, areas where horn/whistle bans are or will be established.  49 C.F.R. § 222.7 ("the Rule").

59. The City of Beverly sought to maintain its "Pre-Rule" Quiet Zone status in its joint petition through the MMA to the DTE.[1]

60. Pursuant to the Rule, the DTE evaluated a number of factors to determine whether a community's specific crossing could qualify as a Quiet Zone qualified as a "Pre-Rule" Quiet Zone including: the number of trains passing over the crossing per day; the allowed train speed; the type of warning devices installed at each crossing such as gates, flashing lights, bells, etc.; and the information provided by the cities/towns regarding the number of accidents that

---

[1] The FRA defines a "Pre-Rule Quiet Zone" as a segment of rail line within which is situated one or a number of consecutive public or private highway/rail grade crossing at which state statutes or local ordinances restricted the routine sounding of locomotive horns, or which locomotive horns did not sound due to formal or informal agreements between the community and the railroad, and such statutes, ordinances or agreements were in place and enforced or observed as of October 9, 1996 and December 18, 2003.  49 C.F.R. at § 222.9.

occurred at each crossing (hereinafter, the "Risk Analysis").  See §§ 222.35, 222.37, 222.39, 222.41, 222.43, 222.47, 222.49.

61.  The Rule required public authorities seeking to establish "Pre-Rule" Quiet Zones to install Supplemental Safety Measures (SSMs) or Alternative Safety Measures (ASMs) at each grade crossing within any proposed Quiet Zone to mitigate additional risk to pedestrians.  See 49 C.F.R. § 222.35.

62.  In its claimed pursuit to obtain continuation of "Pre-Rule" Quiet Zone status, the City of Beverly omitted material information and data which would have alerted the DTE to its disqualification of any continuation of "Pre-Rule" Quiet Zone status under the evaluation of factors promulgated by the FRA.

63.  To obtain continuation of "Pre-Rule" Quiet Zone status, the DTE required municipalities to submit a Risk Analysis for each individual crossing to determine if each crossing qualified under the under the evaluation of factors promulgated by the FRA.

64.  There is no such thing as a city-wide Quiet Zone.

65.  As part of its MMA petition for "Pre-Rule" Quiet Zone status, the City of Beverly submitted data and information pertaining to its Risk Analysis for only seventeen (17) of the twenty-six (26) grade crossings in Beverly.

66.  The City of Beverly did not submit to the DTE any data and information pertaining to any Risk Analysis for the crossings at the Beverly Depot (Crossing Nos. 926103K, 926104S, 926105Y), among other crossings in Beverly.

67.  Consequently, the DTE did not evaluate any information and data pertaining to any Risk Analysis for the other crossings in Beverly when it reviewed and approved the enumerated crossing in the City's submission for approval of "Pre-Rule" Quiet Zone status.

68. Because the DTE never evaluated any information and data pertaining to any Risk Analysis for the grade crossings at the Beverly Depot, among other crossings in Beverly, the crossings at the Beverly Depot were not eligible to receive "Pre-Rule" Quiet Zone approval by the DTE.

69. Because the DTE never evaluated any information and data pertaining to any Risk Analysis for the grade crossings at the Beverly Depot, among other crossings in Beverly, and more fundamentally, because the City never applied for and requested Pre-Rule Quiet Zone status for the crossings at the Beverly Depot, the City of Beverly was not eligible to receive "Pre-Rule" Quiet Zone approval.

70. Because the DTE never evaluated any information and data pertaining to any Risk Analysis for the grade crossings at the Beverly Depot, among other crossings in Beverly, any risk analysis used to create, continue, or justify a whistle ban in Beverly was based on false information.

71. The City of Beverly knew that the Beverly Depot did not qualify for "Pre-Rule" Quiet Zone approval because (1) it omitted the Risk Analysis for several grade crossings, including the Beverly Depot, from its submission for approval to the DTE and (2) more fundamentally, it never applied for and requested Pre-Rule Quiet Zone status for the crossings at the Beverly Depot.

72. The MBTA knew or should have known that the Beverly Depot did not qualify for "Pre-Rule" Quiet Zone approval because (1) the City omitted the Risk Analysis for several grade crossings, including the Beverly Depot, from its submission for approval to the DTE and (2) more fundamentally, the City never applied for and requested Pre-Rule Quiet Zone status for the crossings at the Beverly Depot.

73. Keolis knew or should have known that the Beverly Depot did not qualify for "Pre-Rule" Quiet Zone approval because (1) the City omitted the Risk Analysis for several grade crossings, including the Beverly Depot, from its submission for approval to the DTE and (2) more fundamentally, the City never applied for and requested Pre-Rule Quiet Zone status for the crossings at the Beverly Depot.

74. Public authorities that want to implement ASMs or certain specified non-engineering crossing improvements, within a proposed quiet zone must apply for FRA approval of the effectiveness rate (*i.e.,* the amount of risk that is mitigated by deployment of a safety measure at a crossing) that will be assigned to the crossing improvement(s)).

75. According to § 222.41, "In order to prevent the resumption of locomotive horn sounding on June 24, 2005, the Notice of Quiet Zone Continuation under § 222.41 or § 222.42 of this part shall be served no later than June 3, 2005."

76. On June 3, 2005, the City of Beverly, through its mayor, sent the FRA its "Petition for Continuance of a Quiet Zone as Required by Final Rule published 49 CFR § 222."

77. According to 49 CFR § 222.41, any public authority seeking approval of a "Pre-Rule" Quiet Zone, shall provide "Notice of Quiet Zone Establishment," in accordance with § 222.43 no later than December 24, 2005.

78. On December 23, 2005, the City of Beverly, through its mayor, sent the FRA its "Request for Notice of Establishment of Quiet Zones."

### f.  Misrepresentations by the City of Beverly

79. The City of Beverly, through its mayor, misrepresented to the FRA that the City of Beverly had applied for and obtained "Pre-Rule" Quiet Zone approval for all of its grade crossings, including the crossings at the Beverly Depot.

80. The City of Beverly failed to accurately update the FRA with actual information regarding accidents and fatalities occurring within the city from 2005 until 2019 as required under § 222.49, including accidents and fatalities at the Beverly Depot.

81. By withholding this critical information, the City misrepresented to the DTE and FRA that it could qualify for continuation of "Pre-Rule" Quiet Zone status because the City consistently underreported the number of accidents and fatalities at grade crossings occurring in the City of Beverly.

82. Because the DTE never evaluated any information and data pertaining to any Risk Analysis for the grade crossings at the Beverly Depot, among other crossings in Beverly, any risk analysis used to create or continue a "Pre-Rule" Quiet Zone was based on false information and could not be relied upon by the FRA to establish and/or continue a "Pre-Rule" Quiet Zone.

### g. No SSMs or ASMs at Beverly Depot

83. One of the main purposes of the Rule was to provide local governments a reasonable amount of time as well as the availability of government funds to install required SSMs and ASMs as required under § 222.35.  This was to ensure that the rail crossing met a heightened level of safety so that the significant protection afforded to pedestrians and the public through sounding the horn could not be eliminated.

84. Required SSM's and ASM's were not installed at the pedestrian crossings at the Beverly Depot, as well as at other pedestrian crossings in the city, as required under § 222.35.

85. The City of Beverly withheld the Risk Analysis pertaining to these grade crossings from the DTE and FRA because the City of Beverly did not wish to be financially responsible for the costs associated with implementing SSMs and ASMs at the Beverly Depot required by the FRA such as automatic gates, warning lights, buzzers, signs, signals, signalmen or flagmen,

crossbucks, pavement markings or other safety devices to warn pedestrians of the approaching trains.

86. The City of Beverly knew that the Beverly Depot was not physically equipped with the required SSMs or ASMs under a "Pre-Rule" Quiet Zone designation.

87. The MBTA knew or should have known that the Beverly Depot was not physically equipped with the required SSMs or ASMs under a "Pre-Rule" Quiet Zone designation.

88. Keolis knew or should have known that the Beverly Depot was not physically equipped with the required SSMs or ASMs under a "Pre-Rule" Quiet Zone designation.

89. The operation of the Beverly Depot without the required SSMs and ASMs constituted negligence, and given the risk of harm, recklessness.

90. According to the federal regulations, "Each approach to every pedestrian grade crossing [within a Quiet Zone] shall be equipped by June 24, 2008, with a sign that advises the pedestrian that train horns are not sounded at the crossing." 49 C.F.R. § 222.27.

91. The Beverly Depot was not equipped with the required signage mandated by FRA to warn pedestrians that there are no horns sounded at the Beverly Depot.

92. The MBTA knew or should have known that the Beverly Depot was not equipped with the required signage mandated by the FRA yet continued to operate the Beverly Depot as well as the trains running through the Beverly Depot without the required signage.

93. Keolis knew or should have known that the Beverly Depot was not equipped with the required signage mandated by the FRA yet continued to operate trains running through the Beverly Depot without the required signage.

## COUNT I
### (G.L. c. 229, § 2 NEGLIGENCE vs. KEOLIS)

94.   Plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, repeats and incorporates all allegations stated above.

95.   At all times material to this action, Keolis was a common carrier.

96.   At all times material to this action, Keolis operated trains passing through the Beverly Depot and maintained the Beverly Depot.

97.   Keolis owed a duty of care to all persons arriving at the station intending to ride on a train, including Shumow.

98.   Keolis owed the highest duty of care, a duty of utmost care, to Shumow.

99.   On October 22, 2019, Keolis breached its duty of care and was negligent in the operation of the railroad train identified as Train #155.  Its negligence included but was not limited to:

    a.   operating said train at speeds in excess of the maximum speed permitted by NORAC;

    b.   operating said train at speeds in excess of the speed required by local conditions;

    c.   failing to provide the warnings upon approach to a pedestrian grade crossing as required by law, including the failure to sound the train warning horn as the train approached the Beverly Depot; and

    d.   failing to provide the warnings as required by NORAC, including the failure to sound the train warning horn as several pedestrians and a dog passed in front of the train at the pedestrian grade crossing at the Beverly Depot several seconds before Shumow was struck by the train.

    e.   failing to provide emergency warnings as required by the industry standards, including failure to provide warning to Shumow while he was riding his bicycle along the train tracks.

    f.   failing to adjust the train operations for the known conditions and dangers at the Beverly Depot.

100.   On October 22, 2019, Keolis was negligent in maintaining a safe railroad station at the Beverly Depot.  Its negligence included but was not limited to:

    a.   failing to provide adequate safety measures such as automatic gates, warning lights, buzzers, signs, signals, signalmen or flagmen, crossbucks, pavement markings or other safety devices to warn pedestrians of the approaching trains;

    b.   failing to provide adequate signage warning pedestrians that there are no horns sounded at the Beverly Depot.

    c.   failing to maintain a reasonably safe station platform and pedestrian grade crossing at the Beverly Depot.

101.   Keolis's operation and use of the Beverly Depot as being within a purported Quiet Zone (i.e., not blowing the horn), without being equipped with the required SSMs and ASMs, constituted negligence.

102.   Keolis's maintenance and use of the Beverly Depot without being equipped with the required signage regarding the absence of train horns at the Beverly Depot constituted negligence.

103.   As a direct and proximate result of the negligence of Keolis, Moses Shumow died at the age of 42 when struck and killed by train #155 at the Beverly Depot in Beverly, Massachusetts.

104.   As a result of the foregoing the plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, is entitled to recover damages from Keolis in an amount that is just and appropriate for the losses sustained.

## COUNT II
### (G.L. c. 229, § 2 NEGLIGENCE vs. MBTA)

105.   Plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, repeats and incorporates all allegations stated above.

106.   At all times material to this action, the MBTA owned and controlled the trains operated by Keolis and maintained and controlled the Beverly Depot.

107.   The MBTA owed a duty of care to all passengers arriving at the station intending to ride on a train, including Shumow.

108.   The MBTA owed the highest duty of care, a duty of utmost care, to Shumow.

109.   On October 22, 2019, the MBTA breached its duty of care, and was negligent under the theory of *respondeat superior* for the acts of its agents, Keolis and Drown, in the operation of the railroad train identified as Train #155. Its negligence included but was not limited to:

   a.   operating said train at speeds in excess of the maximum speed permitted by NORAC;

   b.   operating said train at speeds in excess of the speed required by local conditions;

   c.   failing to provide the warnings upon approach to a pedestrian grade crossing as required by law, including the failure to sound the train warning horn as the train approached the Beverly Depot; and

   d.   failing to provide the warnings as required by NORAC, including the failure to sound the train warning horn as several pedestrians and a dog passed in front of the

train at the pedestrian grade crossing at the Beverly Depot several seconds before Shumow was struck by the train.

e.   failing to provide emergency warnings as required by the industry standards, including failure to provide warning to Shumow while he was riding his bicycle on the sidewalk adjacent to the train tracks moments before the collision.

f.   failing to adjust the train operations for the known conditions and dangers at the Beverly Depot.

110.   On October 22, 2019, the MBTA was negligent in maintaining a safe railroad station at the Beverly Depot. Its negligence included but was not limited to:

a.   failing to provide adequate safety measures such as automatic gates, warning lights, buzzers, signs, signals, signalmen or flagmen, crossbucks, pavement markings or other safety devices to warn pedestrians of the approaching trains;

b.   failing to provide adequate signage warning pedestrians that there are no horns sounded at the Beverly Depot.

c.   failing to design a reasonably safe station platform and pedestrian grade crossing at the Beverly Depot.

111.   The MBTA's operation of the Beverly Depot as being within a purported Quiet Zone, (i.e., not blowing the horn), without being equipped with the required SSMs and ASMs, constituted negligence.

112.   The MBTA's failure to provide the required signage regarding the absence of train horns at the Beverly Depot constituted negligence.

113.   As a direct and proximate result of the negligence of the MBTA, Moses Shumow died at the age of 42 when struck and killed by train #155 at the Beverly Depot in Beverly, Massachusetts.

114.   As a result of the foregoing the plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, is entitled to recover damages from the MBTA in an amount that is just and appropriate for the losses sustained.

### COUNT III
### (G.L. c. 229, § 2 NEGLIGENCE vs. DROWN)

115.   Plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, repeats and incorporates all allegations stated above.

116.   Drown, at all times material to this complaint, was an agent of Keolis and MBTA, and owed a duty of care to all passengers arriving at the station intending to ride on a train, including Shumow.

117.   Drown, owed the highest duty of care, a duty of utmost care, to Shumow.

118.   On October 22, 2019, Drown breached his duty of care, and was negligent in the operation of the railroad train identified as Train #155. His negligence included but was not limited to:

   a.   operating said train at speeds in excess of the maximum speed permitted by NORAC;

   b.   operating said train at speeds in excess of the speed required by local conditions;

   c.   failing to provide the warnings upon approach to a pedestrian grade crossing as required by law, including the failure to sound the train warning horn as the train approached the Beverly Depot; and

   d.   failing to provide the warnings as required by NORAC, including the failure to sound the train warning horn as several pedestrians and a dog passed in front of the train at the pedestrian grade crossing at the Beverly Depot several seconds before Shumow was struck by the train.

e.  failing to provide emergency warnings as required by the industry standards, including failure to provide warning to Shumow while he was riding his bicycle on the sidewalk adjacent to the train tracks moments before the collision.

f.  failing to provide emergency warnings as required by the industry standards, including failure to provide warning to Shumow while he was riding his bicycle on the sidewalk adjacent to the train tracks moments before the collision.

g.  failing to adjust the train operations for the known conditions and dangers at the Beverly Depot.

119.  As a direct and proximate result of the negligence of Drown, Moses Shumow died at the age of 42 when struck and killed by train #155 at the Beverly Depot in Beverly, Massachusetts.

120.  As a result of the foregoing the plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, is entitled to recover damages from Drown in an amount that is just and appropriate for the losses sustained.

## <u>COUNT IV</u>
### (G.L. c. 229, § 2 NEGLIGENCE vs. CITY OF BEVERLY)

121.  Plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, repeats and incorporates all allegations stated above.

122.  The City of Beverly owed a duty of care to those persons arriving at stations in Beverly intending to ride the train.

123.  The City of Beverly owed the highest duty of care, a duty of utmost care, to Shumow.

124.  The City of Beverly sought to maintain its Pre-Rule Quiet Zone status (i.e., continue to ban train horns), in its joint petition to the DTE.

125.  In its pursuit to obtain Pre-Rule Quiet Zone status, the City of Beverly breached its duty of care, and was negligent when it omitted material information and data which would have

alerted the DTE to its disqualification of Pre-Rule Quiet Zone status under the evaluation of factors promulgated by the FRA.

126.   Specifically, the City of Beverly withheld important data concerning accidents and fatalities occurring at public grade crossings within the city as well as numerous accidents and fatalities occurring at the Beverly Depot.

127.   In withholding this critical information, the City of Beverly negligently misrepresented to the DTE and FRA that it qualified for Pre-Rule Quiet Zone status because it underreported the number of accidents and fatalities at public grade crossings occurring in the City of Beverly.

128.   The City of Beverly also neglected to accurately update the DTE and the FRA with actual information regarding accidents and fatalities occurring within the city from 2005 until 2019 as required under § 222.49.

129.   The City of Beverly did not obtain the required SSMs and ASMs as required under § 222.35.

130.   The failure to warn pedestrians, including Shumow, of the absence of train horns and/or whistles constituted negligence.

131.   The City of Beverly's negligent misrepresentations regarding material information and data which would have alerted the DTE to its disqualification of Pre-Rule Quiet Zone status under the evaluation of factors promulgated by the FRA, its failure to report the number of train collisions and accidents within the city and its failure to require that the Beverly Depot was equipped with the required SSMs and ASMs in its pursuit to obtain a purported city-wide horn/whistle ban resulted in the silencing of train horns sounded, inadequate signage, including signs warning pedestrians of the absence of horns, and the absence of required SSMs and ASMs present at the Beverly Depot.

132. As a direct and proximate result of the negligence of the City of Beverly, Moses Shumow

     died at the age of 42 when struck and killed by train #155 at the Beverly Depot in Beverly,

     Massachusetts.

133. As a result of the foregoing the plaintiff, Rose Shumow, personal representative of the Estate

     of Moses Shumow, is entitled to recover damages from the City of Beverly, in an amount

     that is just and appropriate for the losses sustained.

**<u>COUNT V</u>**
**(G.L. c. 229, § 2 GROSS NEGLIGENCE, WILLFUL, WANTON, AND RECKLESS
CONDUCT vs. KEOLIS)**

134. Plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, repeats and

     incorporates all allegations stated above.

135. At all times material to this action, Keolis was a common carrier.

136. At all times material to this action, Keolis operated trains passing through the Beverly Depot

     and maintained the Beverly Depot.

137. Keolis owed a duty of care to all persons arriving at the station intending to ride on a train,

     including Shumow.

138. Keolis owed the highest duty of care, a duty of utmost care, to Shumow.

139. Drown, at all times material to this action, was an agent of Keolis and owed a duty of care to

     all passengers arriving at the station intending to ride on a train, including Shumow.

140. On October 22, 2019, Keolis breached its duty of care and was grossly negligent under the

     theory of *respondeat superior* for the acts of its agent, Drown, and by operating a railroad

     with multiple pedestrian grade crossings in a densely settled residential area with knowledge

     that (1) people regularly cross in front of the trains at the Beverly Depot and (2) that people

     have in fact been struck and killed at such crossings in Beverly, including at the Beverly

Depot, Keolis was grossly negligent and strictly liable for Shumow's death in the following ways:

a.  by operating said train at speeds in excess of the maximum speed permitted by NORAC;

b.  by operating said train at speeds in excess of the speed required by local conditions;

c.   by failing to provide the required warnings upon approach to a pedestrian grade crossing as required by law, including the failure to sound the train warning horn as the train approached the Beverly Depot;

d.  by failing to sound an emergency warning as required by industry standards and regulations upon noticing several pedestrians and a dog on the tracks moments before the impact with Shumow;

e.  failing to provide emergency warnings as required by the industry standards, including failure to provide warning to Shumow while he was riding his bicycle on the sidewalk adjacent to the train tracks moments before the collision.

f.  failing to adjust the train operations for the known conditions and dangers at the Beverly Depot.

g.   by failing to maintain adequate safety measures such as automatic gates, warning lights, buzzers, signs, signals, signalmen or flagmen, pavement markings or other safety devices to warn pedestrians of the approaching trains;

h.  by failing to maintain adequate signage warning pedestrians that there are no horns sounded at the Beverly Depot; and

i.  by failing to maintain a reasonably safe station platform and pedestrian grade crossing at the Beverly Depot.

141.   As a direct and proximate result of the gross negligence of Keolis, Moses Shumow died at the age of 42 when struck and killed by train #155 at the Beverly Depot in Beverly, Massachusetts.

142.   As a result of the foregoing the plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, is entitled to recover damages from Keolis in an amount that is just and appropriate for the losses sustained, and for punitive damages.

## COUNT VI
### (G.L. c. 229, § 2 GROSS NEGLIGENCE, WILLFUL, WANTON, AND RECKLESS CONDUCT vs. MBTA)

143.   Plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, repeats and incorporates all allegations stated above.

144.   The MBTA owned and controlled the trains operated by Keolis and maintained and controlled the Beverly Depot.

145.   Drown, at all times material to this action, was an agent of MBTA.

146.   The MBTA owed a duty of care to all passengers arriving at the station intending to ride on a train, including Shumow.

147.   The MBTA owed the highest duty of care, a duty of utmost care, to Shumow.

148.   On October 22, 2019, the MBTA breached its duty of care, and was grossly negligent under the theory of *respondeat superior* for the acts of its agents, Keolis and Drown, and by operating a railroad with multiple pedestrian grade crossings in a densely settled residential area with knowledge that (1) people regularly cross in front of the trains at the Beverly Depot and (2) that people have in fact been struck and killed at such crossings in Beverly, including at the Beverly Depot.  The MBTA was grossly negligent and strictly liable for Shumow's death in the following ways:

a.  by operating said train at speeds in excess of the maximum speed permitted by NORAC;

b.  by operating said train at speeds in excess of the speed required by local conditions;

c.  by failing to provide the warnings upon approach to a pedestrian grade crossing as required by law, including the failure to sound the train warning horn as the train approached the Beverly Depot;

d.  by failing to provide the warnings upon approach to a station platform crossing as required by industry standards, including the failure to sound the train warning horn as the train approached the Beverly Depot;

e.  by failing to sound an emergency warning as required by industry standards and regulations upon noticing several pedestrians and a dog on the tracks moments before the impact with Shumow;

f.  failing to provide emergency warnings as required by the industry standards, including failure to provide warning to Shumow while he was riding his bicycle on the sidewalk adjacent to the train tracks moments before the collision.

g.   by failing to provide adequate safety measures such as automatic gates, warning lights, buzzers, signs, signals, signalmen or flagmen, crossbucks, pavement markings or other safety devices to warn pedestrians of the approaching trains;

h.  by failing to provide adequate signage warning pedestrians that there are no horns sounded at the Beverly Depot; and

i.  by failing to design a reasonably safe station platform and pedestrian grade crossing at the Beverly Depot.

149.   As a direct and proximate result of the gross negligence of the MBTA, Moses Shumow died at the age of 42 when struck and killed by train #155 at the Beverly Depot in Beverly, Massachusetts.

150.   As a result of the foregoing the plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, is entitled to recover damages from the MBTA in an amount that is just and appropriate for the losses sustained, and for punitive damages.

<u>**COUNT VII**</u>
**(G.L. c. 229, § GROSS NEGLIGENCE, WILLFUL, WANTON, AND RECKLESS CONDUCT vs. CITY OF BEVERLY)**

151.   Plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, repeats and incorporates all allegations stated above.

152.   The City of Beverly owed a duty of care to those persons arriving at stations in Beverly intending to ride the train.

153.   The City of Beverly owed the highest duty of care, a duty of utmost care, to Shumow.

154.   The City of Beverly sought to maintain its Pre-Rule Quiet Zone status (i.e., continue to ban train horns,) in its joint petition to the DTE.

155.   In its pursuit to obtain Pre-Rule Quiet Zone status, the City of Beverly breached its duty of care, and was grossly negligent when it omitted material information and data which would have alerted the DTE to its disqualification of Pre-Rule Quiet Zone status under the evaluation of factors promulgated by the FRA.

156.   In its claimed pursuit to obtain "Pre-Rule" Quiet Zone status, the City of Beverly omitted material information and data which would have alerted the DTE to its disqualification of Pre-Rule Quiet Zone status under the evaluation of factors promulgated by the FRA.

157. Further, the City of Beverly did not obtain the required SSMs and ASMs at the Beverly Depot, as required under § 222.35.

158. According to the federal regulations, "Each approach to every pedestrian grade crossing [within a Quiet Zone] shall be equipped by June 24, 2008, with a sign that advises the pedestrian that train horns are not sounded at the crossing.  49 C.F.R. § 222.27.

159. The Beverly Depot does not provide any such signage, contrary to the federal mandate.  The failure to warn pedestrians, including Shumow, of the absence of train horns and whistles, constituted gross negligence.

160. The City of Beverly's misrepresentations regarding material information and data which would have alerted the DTE to its disqualification of Pre-Rule Quiet Zone status under the evaluation of factors promulgated by the FRA, its failure to report the number of train collisions and accidents within the city and its failure to require that the Beverly Depot was equipped with the required SSMs and ASMs in its pursuit to obtain a purported city-wide whistle ban resulted in the silencing of train horns sounded, inadequate signage, including signs warning pedestrians of the absence of horns, and the absence of required SSMs and ASMs present at the Beverly Depot constituted gross negligence toward the health and safety of its citizens, including Shumow and the City is strictly liable for Shumow's death.

161. As a direct and proximate result of the gross negligence of the City of Beverly, Moses Shumow died at the age of 42 when struck and killed by train #155 at the Beverly Depot in Beverly, Massachusetts.

162. As a result of the foregoing the plaintiff, Rose Shumow, personal representative of the Estate of Moses Shumow, is entitled to recover damages from the City of Beverly, in an amount that is just and appropriate for the losses sustained, and for punitive damages.

WHEREFORE, the Plaintiffs request that this Court:

1. Award compensatory damages against the Defendants.

2. Award punitive damages against Defendants.

3. Award the costs of this action, including attorney's fees and

4. Award such other and further relief, as this Court may deem necessary and appropriate.

## V.   **JURY DEMAND**

A JURY TRIAL IS HEREBY DEMANDED.

ROSE SHUMOW, as Personal Representative of the Estate of MOSES SHUMOW, By Her Attorney,

*/s/ Austin J. Freeley*
Austin J. Freeley, Esq.
Law Office of Austin J. Freeley
BBO#563349
171 Milk Street
Boston, MA 02109
(617) 723-9538
Freeleybostonlaw@gmail.com

Dated:  September 26, 2022