UNITED STATES DISTRICT COURT
OF THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROSE SHUMOW, as Personal Representative of the Estate of MOSES SHUMOW,<br><br>   Plaintiff,<br><br>v.<br><br>KEOLIS COMMUTER SERVICES, LLC, MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATHAN DROWN, and CITY OF BEVERLY,<br><br>   Defendants. | Civil Action No. 1:22-cv-11623-DJC |

## **DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS OF RECORD**

The defendants Keolis Commuter Services, LLC (Keolis), the Massachusetts Bay Transportation Authority (MBTA), and Nathan Drown (Drown) submit this concise statement of the undisputed material facts of record pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.

The Parties

1. The plaintiff Rose Shumow is the personal representative of Moses Shumow's estate. (Ex. 1, Amended Compl. ¶ 2).

2. The defendant the MBTA is a body politic organized and created pursuant to G. L c. 161A. (Ex. 1, Amended Compl. ¶ 4).

3. At all relevant times the MBTA owned the subject Beverly Depot commuter rail station's (Beverly Station) platforms, station pedestrian crossings, the train tracks, and the warnings posted at the station. (Ex. 10, Muller Aff. ¶ 14).

4. At all relevant times the MBTA owned the subject commuter rail train. (Ex. 2, Defs' Ans. to Amended Compl. ¶ 10).

5. The defendant Keolis is a corporation duly established by law with a principal place of business in Boston. (Ex. 1, Amended Compl. ¶ 3).

6. At all relevant times Keolis, by agreement with the MBTA, has operated the MBTA's commuter rail trains and has maintained the MBTA's commuter rail assets. (Ex. 10, Muller Aff. ¶ 7).

7. At all relevant times defendant Drown was employed by Keolis as a locomotive engineer. (Ex. 11, Drown Dep. p. 7).

8. On October 22, 2019 (accident date), Drown operated the train at the time of the accident. (Ex. 2, Defs' Ans. to Amended Compl. ¶ 11).

9. The defendant City of Beverly (City) is a municipality duly incorporated under the laws of the Commonwealth of Massachusetts. (Ex. 1, Amended Compl. ¶ 6).

10. The Beverly Station is located at 10 Park Street in Beverly, Massachusetts. (Ex. 11, Muller Aff. ¶ 3).

Decedent - Moses Shumow (Shumow)

11. On the accident date Shumow was 42 years old. (Ex. 1, Amended Compl. ¶ 104).

12. Shumow received his bachelor's degree from New Mexico State University in 2000 and obtained his master's degree in broadcast journalism from Emerson College in 2001. (Ex. 12, Pl.'s Dep. p. 12; Ex. 13, Curriculum Vitae).

13. In 2010, Shumow received a Ph.D. in communications from the University of Miami. (Ex. 12 Pl.'s Dep. p. 12; Ex. 13, Curriculum Vitae). Shumow had been a professor at Florida International University from 2010-2019. (Ex. 12, Pl.'s Dep., p. 13; Ex. 13, Curriculum Vitae).

14. In 2019, Shumow became a tenured professor at Emerson College in Boston and moved to the City in June 2019. (Ex. 12, Pl.'s Dep. pp. 15-17).

15. Shumow began working at Emerson College in early September 2019. (Ex. 12, Pl.'s Dep. p. 72). The accident date was not the first time Shumow had used the Beverly Station. Id., p. 73. Shumow taught classes at Emerson College on Tuesdays and Thursdays and often went into work on other days for labs and meetings. Id., p. 17. Shumow often rode his bike to the Beverly Station and usually took the commuter rail train to commute to and from Emerson College. Id., pp. 18, 20-21. Shumow was aware that trains frequently operated at the station during the week. Id., pp. 31-32.

16. Shumow did not suffer from any disabilities, illnesses, diseases, affliction, physical handicaps, or impairment of his vision or hearing. (Ex. 4, Pl.'s Ans. To Drown's Revised

   Interrogatory No. 13).  He was very healthy and in excellent physical condition.  Id., No. 14.

The Station and Crossing

17. Beverly Station is an outdoor commuter rail station.  (Ex. 8, Mellen Rep. p. 2).

18. Exhibit 14, contains a photograph that fairly and accurately depicts the subject station and crossing in October 2019.  (Ex. 15, Mellen Dep. Vol. 1, p. 23).

19. On the accident date the Beverly Station was located adjacent to the Beverly Depot restaurant.  (Ex. 8, Mellen Rep. p. 2).  The station served the Newburyport/Rockport lines of the MBTA commuter rail network.  Id.  Two commuter tracks (tracks 1 and 2) ran through the station.  Id.  Track 1 generally served the MBTA's outbound trains to Rockport/Newburyport and track 2 (closest to the restaurant) generally served the inbound trains to Boston.  Id.  There was a parking lot west of the track 2 platform and a parking lot east of the track 1 platform.  Id.

20. The platforms ran along the length of the track within the station and were the designated areas where patrons could board and exit the trains from the respective tracks.  (Ex. 8, Mellen Rep. p. 2; Ex. 14, Photograph).  The platform areas provided a clear view of the tracks and any approaching train from either direction.  Id.

21. On each platform, a visually contrasting bright yellow tactile strip ran along the inner edge of each platform closest to the tracks to delineate the edge of the platform from the tracks.  (Ex. 8, Mellen Rep. p. 2; Ex. 14, Photograph).  Along that strip, there were repetitious yellow markings on the pavement that read "STAND BACK."  (Ex. 8, Mellen Rep. pp. 2-3; Ex. 14, Photograph).  The outer edges of the platforms away from the tracks were delineated by a series of bright yellow bollards (posts) that delineated the platform from the parking lot and also inhibited vehicles from driving onto the platforms.  (Ex. 8, p. 2).  The bollards were designed to further to reduce the probability of pedestrians stepping out into the crossing without looking for oncoming trains.  Id., p. 5.  On the track 2 platform, there were light emitting diode (LED) electronic signs that announced the time when a train would be arriving at the station.  Id., p. 3.

22. Intertrack fencing ran between the two tracks to the ends of the station platforms.  (Ex. 8, Mellen Rep. p. 2; Ex 14, Photograph).  The station had three crossings that went over the two railroad tracks through "cut-outs" in the intertrack fencing to provide designated pathways for pedestrians to access the platforms.  Id.  Two were located in front of the restaurant and the other was located further up the station in the outbound direction near the mini high platforms.  Id.  The intertrack fencing with the cut-outs for the crossings channeled passenger flow towards the marked crossing surface where passengers could cross safely.  (Ex. 8, Mellen Rep. p. 5).  The crossings were located where pedestrian traffic was the greatest and where it would be be blocked by a train that was stopped within the station to prevent unauthorized pedestrian track crossings.  Id., p. 6.  The crossings were located to the right of the curb cut out to prevent pedestrians from

3

stepping straight out into the crossings without looking and to exercise further caution as they entered the platform area. Id., p. 5.

23. At each of the crossings there were round yellow signs affixed to the intertrack fencing with the words, "LOOK BEFORE CROSSING." (Ex. 8, Mellen Rep. p. 2; Ex. 14, Photograph). Anyone approaching the crossing in order to cross would have to walk directly towards the sign and face the sign and the tracks to be able to see the sign, the tracks, and any oncoming train. Id.

24. On the accident date the station's infrastructure was owned and controlled by the MBTA, including the platforms, pedestrian station crossings, the intertrack fencing, and the various warnings. (Ex. 10, Muller Aff. ¶ 14). The MBTA controlled and determined what warnings and safeguards were placed at the station, including at the subject pedestrian crossing. Id., ¶ 17.

25. Train activated warning systems such as flashing light signals, crossing bells, or gates were not mandated at the crossing by federal or state law or any other regulation. (Ex. 8, Mellen Rep. p. 4; 9, Palazzollo Rep. p. 3). Similarly, gates, lights, buzzers, bells, horns, additional/or different signage, signalman or flagman, additional/or different markings or other traffic control safety devices were not mandated at the station. (Ex. 8, Mellen Rep. p. 4).

26. The MBTA never received any recommendation from the Federal Railroad Administration (FRA) with respect to the Beverly pedestrian crossing and the MBTA has never received any recommendation as to what specific safety mechanism should be in place at the Beverly Station. (Ex. 15, Mellen Dep. Vol. I, pp. 52, 80-81).

27. On June 27, 2019, the subject crossing was inspected by the FRA, the regulatory agency that governs railroads. (Ex. 9, Palazzollo Rep. p. 6). After inspection, the FRA made no recommendation for safety improvements and no corrective action was instructed. Id.

28. The subject crossing was a pedestrian crossing and not a public highway rail grade crossing. (Ex. 5, Percival Rep. p 3; Ex. 9, Palazzollo Rep. p. 5; Ex. 11, Drown Dep. p. 133; Ex. 18, MBTA Dep. p. 209). A highway rail grade crossing is an intersection of a roadway that is for motor vehicle purposes and a railroad that cross at the same level. (Ex. 9, Palazzollo Rep. p. 5; Ex. 18, MBTA Dep. p. 209). The station did not have a crossing in which a public highway ran through it and the crossing was not for the purpose of vehicular traffic but for pedestrians to access the platforms. (Ex. 9, Palazzollo Rep. p. 5; Ex. 30, Scanlon Dep. p. 146).

29. Pedestrian crossings, like this Beverly crossing, exist all over the United States. (Ex. 8, Mellen Rep. p. 6). There are numerous similar crossings within the MBTA's commuter rail network. Id. MBTA commuter rail trains operate over these types of crossings across the entire MBTA system with thousands of passengers utilizing them daily. (Ex, 8, Mellen Rep. p. 6; Ex. 15, Mellen Dep. Vol. I, p. 86). Except in rare stances,

pedestrians do not cross in front of an approaching train. (Ex. 8, Mellen Rep. p. 6). Beverly Station is no exception. Id.

30. The types of safety measures at stations with pedestrian crossings depends on the crossing itself as well as the geometric, environmental, and physical constraints within that station. (Ex. 15, Mellen Dep. Vol. I, pp. 41, 96-97, 114-116; Ex. 18, MBTA Dep. p. 61). They would be a case-by-case basis. (Ex. 15, Mellen Dep. Vol. I, pp. 96, 129). There is no "one-size-fits-all" solution or standard. (Ex. 15, Mellen Dep. p. 117; Ex, 18, MBTA Dep. p. 61). Cost would also be a factor. (Ex. 18, MBTA Dep., p. 132).

31. There are fifty-eight station crossings on the MBTA's commuter rail network. (Ex. 17, Palazzolo Dep. p. 23). Forty-one are equipped with the same warning system as that of the Beverly Station. Id. At some stations, it would not be feasible to have train activated warning systems. Id., p. 132. Installing physical barriers such as gates at the station could also create a safety issue such as trapping persons on the tracks. (Ex. 8, Mellen Rep. p. 5). As noted by the FRA, "the best safety devices in the world cannot overcome poor judgment." Id.

32. To eliminate the crossings at the Beverly Station and to construct an overpass or a bridge would require the full reconstruction of the station to comply with the regulations of Massachusetts Architect Accessibility Board. (Ex. 8, Mellen Rep. p. 8). Such reconstruction would cost approximately $40 million. Id. Furthermore, the Beverly Station contains a historical building which would also impede any such construction. Id.

33. The Beverly Station facility was constructed and opened to the public in 1839, by Eastern Railroad (Eastern). (Ex. 10, Muller Aff. ¶ 9). In 1890, Boston & Maine Railroad (B&M) purchased Eastern and constructed the present station building in 1897. Id. That building was sold in the 1960s and has served as a restaurant since 1971. Id. That building has been listed on the National Register of Historic Places since 1979. Id. The dual set of tracks, the platforms, and the subject pedestrian crossing have been in existence and in the same arrangement and in their current location since at least 1910. Id., ¶ 10.

34. In 1976, the MBTA purchased B&M's commuter rail assets, including the tracks, platforms, and station crossings at this Beverly station. (Ex. 10, Muller Aff. ¶ 11).

35. In 1985, the MBTA made improvements to the Beverly Station as part of the MBTA's Transit Park-Ride Improvement program. (Ex. 10, Muller Aff. ¶ 12). As part of that program, the MBTA preserved the existing infrastructure of the station and made improvements to the station by resurfacing and extending the existing platforms, resurfacing the existing pedestrian crossings, installing a third pedestrian crossing, installing the intertrack fencing, installing mini-high accessibility platforms to provide accessible level train boarding surface for individuals with mobility restrictions, and installing various warnings including the yellow tactile warning strip, "STAND BACK" platform markings, and "LOOK BEFORE CROSSING" warning signs. Id. There have been no changes from that time to the time of the subject accident. Id., ¶ 13.

36. At all relevant times, Keolis had no authority to unilaterally install, change, or modify the existing infrastructure at the Beverly Station. (Ex. 10, Muller Aff. ¶¶ 16-17).

37. At all relevant times, Keolis had no authority to unilaterally determine, install, change, or modify the warnings at Beverly Station, including the markings, fencing, and signage. (Ex. 10, Muller Aff. ¶17). At all relevant times, Keolis did not have the authority to implement active warning systems at the Beverly Station, including gates, lights, and bells. Id.

The Accident

38. On the accident date, Shumow, wearing in-the-ear headphones, rode his bicycle to the Beverly Station to take the train into Boston at approximately 8:15 a.m. (Ex. 1, Amended Compl. ¶ 8; Ex. 12, Pl's Dep. p. 38).

39. The incident was captured by a camera on the locomotive of the train. (Ex. 5, Percival Rep. p. 1).

40. Exhibit 5, contains a USB flash drive containing a true and accurate copy of the video capturing Shumow's accident. (Ex. 5, Percival Rep. p. 2 and attached Ex. A). https://www.loom.com/share/b08d04bf5d69480a9c0bd97726f8c1c0?sid=81a195e3-a991-4d4a-8c06-0d18281800a7

41. Exhibit 6, contains a true and accurate copy of still images taken from the video that captured Shumow's accident. (Ex. 6, Percival Aff. ¶ 6 and attached Ex. A).

42. According to the video, the train approached the station with the its bells activated on the outbound track (track 1). (Ex. 5, Video).

43. At the same time, according to the video, a group of pedestrians walked across the station crossing from the track 1 to the track 2 side without incident. (Ex. 5, Video).

44. According to the video, several seconds after the group crossed the tracks, Shumow rode his bike onto the outbound (track 1) and turned right onto station platform. (Ex. 5, Video).

45. According to the video, Shumow rode his bicycle on the platform, away from the yellow warning tactile strip, and away from the tracks, and parallel to the train tracks in the same direction as the approaching train. (Ex. 5, Video).

46. According to the video, Shumow approached the crossing, turned his head over his left shoulder, and looked towards the oncoming train. (video). The horn of the train can be heard at this time. (Ex. 5, Video).

47. According to the video, when the front of the train was at the crossing, Shumow turned left, accelerated his bike, and immediately collided with the train. (Ex. 5, Video).

Witnesses to the Accident

48. On the accident date Emily O'Connor (Emily) had been a Beverly resident since 2013 and regularly used the MBTA commuter train at Beverly Station to commute to and from her job at Massachusetts General Hospital in Boston. Id., pp. 7-10, 28. She had a monthly train pass and a parking sticker for the Beverly Station. Id., p. 9-10, 29.

49. On the date of the accident Emily was going to take the train to work. (Ex. 19, O'Connor Dep. pp. 12-14).

50. She drove to the station and parked in one of the spots in the first row of parking spaces closest to the outbound platform, facing the outbound platform and the tracks. (Ex. 19, O'Connor Dep. pp. 13-14.

51. Emily was early for her train, so she sat in her car and waited. (Ex. 19, O'Connor Dep. pp. 14-15). Her car was facing the station platform. Id., p. 14.

52. While waiting, Emily saw a person (Shumow) ride his bike between the driver's side of her car and the car next to her. (Ex. 19, O'Connor Dep. pp. 14-16). She observed that the biker was wearing earbuds. Id., pp. 14, 16.

53. Shumow passed Emily's car and rode his bike straight onto the platform. (Ex. 19, O'Connor Dep. p. 16).

54. From her car with the doors closed, Emily heard the train, the train's bells, the train's horn, and saw the train's lights signaling that the train was coming. (Ex. 19, O'Connor Dep. pp. 14, 17). She thought to herself, "He's going to stop, right? He's going to stop." Id., p. 14. However, the Shumow did not stop, crossed in front of the train, and he collided with the train. Id., p. 14. It all happened in front of her. Id., p.20.

55. From the time Emily saw Shumow to the time of the strike, it was enough time for her to be "cognizant of what was happening...and thought that [Shumow] would stop and then was shocked" that he did not. (Ex. 19, O'Connor Dep. p. 44).

56. There was "plenty of notice that the train was coming." (Ex. 19, O'Connor Dep. p. 36). The sound of the train, its bells, and horn warned of the oncoming train. Id.

57. Emily heard the bells that signaled that a train was coming. (Ex. 19, O'Connor Dep. p. 22). She heard the train's horn prior to seeing the train. Id., p. 40. It was blowing loudly. Id., p. 21. The horn was louder and longer than the standard horn as it was clear that Shumow was not going to stop. Id., p. 37. She heard the horn and thought Shumow should have stopped. Id., p. 44.

58. Emily called 9-1-1. (Ex. 19, O'Connor Dep. p. 17). Afterwards, she got out of her car and met with a Beverly police officer. Id., p. 18.

7

59.  The officer asked Emily to write a statement. (Ex. 19, O'Connor Dep. pp. 18-9).

60.  Exhibit 21, is a true and accurate copy of Emily's written statement that she provided to the police officer. (Ex. 19, O'Connor Dep. pp. 19-20; Exhibit 21, Statement). She wrote the statement within 30 minutes after the incident when the events were fresh in her mind. (Ex. 19, O'Connor Dep. p. 21).

61.  Prior to this accident, Emily had never witnessed any close calls between people crossing the tracks and the train entered the Beverly Station. (Ex.19, O'Connor Dep. p. 30). People regularly crossed the tracks to get from the outbound platform to the inbound platform. Id. However, Emily testified that it was "absolutely not" a common occurrence for someone to cross the tracks at the Beverly Station when a train was visible. Id., p. 31. Emily further asserted that pedestrians "would wait until the train has safely gone by" before crossing. Id.

62.  On the accident date Jennifer Startek (Jennifer) had been a Beverly resident since 2014. (Ex. 22, Startek Dep. pp. 6-7).

63.  In 2019, Jennifer worked at Massachusetts General Hospital in Boston and commuted to and from work every week day by train from the Beverly Station. (Ex. 22. Startek Dep. pp. 9-10). She had been a regular commuter since June 2018. Id., p. 32.

64.  After the incident Jennifer provided a written statement to a police officer. (Ex. 22. Startek Dep. pp. 14-16).

65.  Exhibit 24, is a true and accurate copy of Jennifer's statement written within thirty minutes of the incident when the events were "very" fresh in her mind. (Ex. 22, Startek Dep. pp. 15-17).

66.  Jennifer was going to take the inbound train departing at 8:24 a.m. (Ex. 22, Startek Dep. p. 11). She left her home at 8:14 a.m. and walked onto the outbound platform. Id., pp. 10-12, 13, 18.

67.  Exhibit 23, is a photograph of the station and the line and arrow showing Jennifer's path of travel from her home to the platform. (Ex. 22, Startek Dep. p. 56)

68.  On the platform, Jennifer walked in the northerly direction towards Rockport/Newburyport. (Ex. 22, Startek Dep. p. 14).

69.  The outbound train was entering the station with its bells ringing. (Ex. 22, Startek Dep. pp. 17-18; Ex. 24, Statement). She testified that the train's bells always ring as the train comes into the station. (Ex. 22, Startek Dep. p. 22).

70.  Jennifer "heard, felt, smelled, and saw the train coming behind" her. (Ex. 22, Startek Dep. p. 18). She heard the rumbling of the train approaching from behind. Id., p. 20.

She could also smell the train, like diesel or gas. Id., pp. 20-21. She heard the loud and long horn of the train from behind her. Id., pp. 20, 37. The horn was blaring; long, loud blares. Id., p. 22. It was very loud; very emergent level of horn use. Id., p. 22. The train passed Jennifer as she was slowly walking toward the station crossing. Id., p. 21.

71. Jennifer stopped to wait for the train. (Ex. 22, Startek Dep. pp. 17, 22; Ex. 24, Statement).

72. She "noticed a bicyclist [Shumow] come flying from behind" her. (Ex. 22, Startek Dep. p. 18). As Shumow passed her, his back was to her. Id., p. 24. She thought how rude it was for Shumow to ride his bike at that speed down the platform. Id., pp. 18, 21.

73. Shumow was ahead of Jennifer. (Ex. 22, Startek Dep. p. 17; Ex. 24, Statement). She watched him. Id., p. 18. Shumow did not stop or slow down. Id., pp. 17, 19. Shumow traveled in a straight line on the platform. Id., p. 40.

74. Exhibit 25, is a photograph that shows the platform on which she was walking with Shumow. (Ex. 22, Startek Dep. pp. 26-27). He was about 20 feet ahead. Id., p. 28.

75. When Shumow approached the crossing, he did not stop. (Ex. 22, Startek Dep. p. 23). He got to the crossing and turned his head and upper body to the left in her direction and looked behind him down the tracks and towards the train. Id., pp. 17, 24, 28 57. He turned his bike perpendicular to the track. Id., 52. Shumow turned his head towards the train. Id., pp. 28, 51-52. The train was approximately 20-30 feet behind Shumow, when he turned to the left. Id., p. 51. The tracks were visible to him. Id., p. 24. At that time, the train was between him and Jennfer. Id., p. 25. She looked right at him and they were face-to-face with each other. Id., p. 52.

76. While looking in the direction of the oncoming train, Shumow did not stop and proceeded across the pathway anyway. (Ex. 22, Startek Dep. p. 25). He "darted out" right in front of the train and collided with the train. Id., p. 17. Jennifer could not believe he turned into the path of the train because he had turned and looked to see that the train was approaching. Id., pp. 17, 25. The train came to a screeching halt. Id., pp. 17, 26.

77. In Jennifer's experience, on a typical weekday at approximately 8:24 a.m., there would be around 60 people on the platform at Beverly Station. (Ex. 22, Startek Dep. p. 33). It was not a frequent occurrence to see people cross the tracks at the Beverly Station when a train was in sight and she has never observed any close calls at the train station between a train and a pedestrian. Id., pp. 34-35.

78. On the accident date, Kathleen Grattan (Kathleen) had been a resident of Beverly since 2004. (Ex. 26, Grattan Dep. pp. 5, 8). In 2019, she was employed in Boston and had been for approximately 15 years. Id., p. 7. She used the commuter rail train at the Beverly Station every weekday to commute to and from her work. Id., pp. 8-9.

79. On the accident date, Kathleen drove to the station and parked in the parking lot adjacent to a park. (Ex. 26, Grattan Dep. pp. 19-20).

80. She walked onto the outbound side platform and was walking towards the last pedestrian crossing towards Newburyport/Rockport. (Ex. 26, Grattan Dep. p. 21). It was her intention to cross at that crossing to get to the inbound platform. Id.

81. As she was walking, Kathleen heard either the train's bell or horn and saw the train and the train's lights. (Ex. 26, Grattan Dep. p. 21). She looked back and observed the outbound train approaching. Id., p. 28.

82. Kathleen stopped and stayed put because the train was going to stop at the station and would block the station crossing. (Ex. 26, Grattan Dep. p. 22). She stopped near the shelter on the outbound platform. Id., pp. 24-25

83. While Kathleen was stopped, she saw a person on a bike (Shumow) on the same platform as her and riding towards her. (Ex. 26, Grattan Dep. p. 26). She was looking towards Boston and Shumow was coming towards her. Id. No one else was crossing the tracks when Shumow was approaching. Id., p. 49.

84. The red circle drawn on Exhibit 27, shows the location where Kathleen was standing. (Grattan Dep. p. 53). The red "X" shows the location where she first saw Shumow. Id.

85. Shumow was pedaling fast and moving quickly in Kathleen's direction which made her think that he was going to cross in front of the train. (Ex. 26, Grattan Dep. pp. 27-29). She vigorously waved her right hand back forth and yelled loudly at Shumow multiple times, "No! Train, Train!" Id., p. 30.

86. Exhibit 28, fairly and accurately shows the station and Shumow just before the train pulled up to the crossing. (Ex. 26, Grattan Dep. pp. 36-38). The photograph shows when Kathleen observed Shumow pedal quickly. Id., p. 38).

87. Shumow appeared to look back and then, to Kathleen's "utter anguish, he went for it," and crossed in front of the train. (Ex. 26, Grattan Dep. pp. 30, 32).

88. After the incident Kathleen provided a written statement to a police officer. (Ex, 26, Grattan Dep. p. 15).

89. Exhibit 29, is a true and accurate copy of that statement written at the scene within thirty minutes of the incident when the events were very fresh in Kathleen's mind. (Ex. 26, Grattan Dep. pp. 15-18).

90. In her 20 years of living in Beverly, Kathleen remembered only one incident where someone tried to cross in front of an approaching train near the station. (Ex. 26, Grattan Dep. pp. 48-49). It was years prior to this accident, when a woman slipped and fell on ice and scrambled up and crossed. Id.

Train operation

91. Engineer Drown had been employed as a locomotive engineer by Keolis since 2014. (Ex. 11, Drown Dep. p. 7). Prior to Keolis, he had been a locomotive engineer for Massachusetts Bay Commuter Railroad Company, the predecessor contractual commuter rail operator for the MBTA since 2011 and started working as an engineer in 1998. Id., p. 8. Overall, at the time of the accident, Drown had over 21 years of experience as a locomotive engineer. Id., pp. 7-8.

92. Drown had operated a train on the Newburyport/Rockport line since January 2011. (Ex. 11, Drown Dep. p. 61). Drown had operated a train through Beverly Station over 8,000 times in his career. Id., p. 58.

93. In Drown's experience, it was only a common occurrence for people to cross at the Beverly Station if the train was stopped or at a safe distance away. (Ex. 11, Drown Dep. pp. 65, 106). In his experience, people did not put themselves in front of the train and put themselves at risk. Id.., pp. 65, 102-103.

94. Drown was unaware of any near misses or incidents at the Beverly Station. (Ex. 11, Drown Dep. pp. 103, 113). Drown had never been involved in any other incidents at the Beverly Station prior to the date of the accident. Id., pp. 112-13.

95. On the accident date as the train was approaching the Beverly Station, Drown observed a group of people crossing from the track 1 side to the track 2 side. (Ex. 11, Drown Dep. pp. 27).

96. After that group of people cleared the tracks, Drown observed a person on a bike (Shumow) traveling in the same direction as the train. (Ex. 11, Drown Dep. pp. 21, 36-37).

97. Drown observed Shumow turn his body as if he were looking at the train and then at the last second Shumow drove his bike onto the tracks directly in front of the train. (Drown Dep. pp. 22, 25-26).

98. There was not much time to for Drown to think about the horn before Shumow turned in front of the train; it was almost instantaneous. (Ex. 11, Drown Dep. p. 36).

99. In Drown's experience, people move out of the way when the train's horn is blown. (Drown Dep. pp. 56-57). In his experience, people do not put themselves in front of a train. Id., p. 102.

100. On the accident date, the train had an "event recorder" located on the locomotive engine. (Ex. 5, Percival Rep. p. 2). The event recorder is similar in purpose to "black boxes" located on airplanes in that it records various information taken from the train's engine during its operation. Id. Examples of information recorded on the event recorders are

11

the speed of the engine, brake pressure, the use of the horn, the use of the bell, emergency brake application, and throttle use.  Id.

101. According to the event recorder data, the train was traveling at 38.2 miles per hour as it approached the station.  (Ex. 5, Percival Rep. p. 5).  As the train continued to approach and enter the station, the brakes were applied and the train's speed incrementally reduced to 37.2, 36.7, 35.6, 34.3, and 33.2 miles per hour, at which point the emergency brake was applied and the accident occurred.  Id.

102. According to the event recorder data, at the time the train's emergency brake was applied at 8:23:30 (event recorder time stamp), the engine was traveling at 33 miles per hour.  (Ex. 5, Percival Rep. p. 2).

103. According to the event recorder data, prior to the application of the emergency brake, the train's bells were activated for thirty-three seconds from 8:22:57 to 8:23:30.  (Ex. 5, Percival Rep. p. 2).

104. According to the event data recorder, prior to the application of the emergency brake, the horn was activated for three seconds from 8:23:27 to 8:23:30.  (Ex. 5, Percival Rep. p. 2).

105. The speed for commuter rail trains in the MBTA's commuter rail system is governed by the Federal Railroad Administration, 49 C.F.R. § 213.9(a).  (Ex. 7, Aff. Farraro, ¶ 5).

106. On October 22, 2019, the maximum allowable operating speed for track 1 on the Newburyport/Rockport line that ran through Beverly Station and through the pedestrian crossing established by the Federal Railroad Administration (FRA) was 80 miles per hour.  (Ex. 7, Aff. Farraro, ¶ 7).

107. In his operation of the train, Drown was required to comply with Keolis' Commuter Rail Service Timetable (Timetable) and the Northeast Operating Rules Advisory Committee's Operating Rules (NORAC).  (Ex. 5, Percival Rep. p. 3, Ex. 11, Drown Dep. p. 11).

108. NORAC provides that trains must not be operated in excess of the maximum authorized speed.  (Ex. 32, NORAC p. 49).

109. Pursuant to the Timetable, the maximum authorized speed limit for area of the accident was 70 miles per hour.  (Ex. 5, Percival Rep. p. 4; Ex. 31, Timetable)

110. There was no speed requirement below the 70 miles per hour for the train coming into Beverly Station for a station stop.  (Ex. 5, Percival Rep. p. 5, Ex. 11, Drown p. 130).  Rather, it is in the judgment and experience of the engineer as to what speed is necessary in performing a safe and controlled station stop and to properly stop the train at the designated location within the station.  Id.

111. On the accident date, the train's speed was in compliance with the speed limit established by the FRA and the more stringent speed limit set by the Timetable.  (Ex. 5, Percival Rep. p. 5).

112. Pursuant to the Timetable, the train's bell was required to be sounded when approaching all station platforms.  (Ex. 5, Percival Rep. p. 3; Ex. 31, Timetable).  Once the train's bells were activated, oscillating and flashing ditch lights – which are two headlights located on the front of the train – were also activated to provide warning.  (Ex. 5, Percival Rep. p. 3; Ex. 11, Drown Dep. pp. 17-18).

113. On the accident date Drown's operation of the train complied with the Timetable by continuously ringing the train's bells from 8:22:57, as the train approached the Beverly Station to 8:23:44, at which time the train came to a stop.  (Ex. 5, Percival Rep. p. 4).

114. On the accident date Drown was required to sound the horn at locations identified in the Timetable and NORAC.  (Ex. 5, Percival Rep. 3; Ex. 11, Drown Dep. pp. 16-17).  NORAC prohibited the unnecessary use of the train's horn.  (Ex. 5, Percival Rep. p.4; Ex. 32, NORAC).

115. On the accident date NORAC and Timetable did not require the train's horn to be sounded when approaching or entering the Beverly Station.  (Ex. 5, Percival Rep. p. 3; Ex. 11, Drown 17-18).

116. Pursuant to NORAC, the engine bells were required to be sounded in an emergency situation.  (Ex. 5, Percival Rep. p. 4; Ex. 32, NORAC).

117. On the accident date, the Timetable authorized, but not required Drown to sound the horn in an "emergency" situation.  (Ex. 5, Percival Rep. p. 4; Ex. 11, Drown Dep. pp. 45-46; Ex. 31, Timetable).  Federal regulations authorized the engineer to sound the horn in an emergency situation if, in the locomotive engineer's sole judgment, such action was appropriate.  (Ex. 5, Percival Rep. p. 4).  NORAC prohibited the unnecessary use of the engine whistle or horn.  (Ex. 5, Percival Rep. 4; Ex. 32, NORAC).

118. It was in the sole discretion and judgment of the engineer to determine what constituted an emergency situation.  (Ex. 5, Percival Rep. p. 4; Ex. 11, Drown Dep. pp. 45-46).  It was an "on-the-spot" determination made by the engineer.  (Ex. 11, Drown Dep. p. 50). From the time the train approached the station to the time the horn was sounded, Shumow was located away from the tracks, beyond the yellow tactile strip, and traveling parallel with the train on the platform.  (Ex. 5, Percival Rep. p. 4).  Shumow looked over his shoulder towards the train and then nevertheless propelled his bicycle towards the train which then prompted the engineer to sound the train's horn and engage the emergency brake application.  Id., p. 5.

119. On the accident date, Drown sounded the train's horn in accordance with NORAC and the Timetable.  (Ex. 5, Percival Rep. p. 4).

Dated: 7/31/24

Defendants,
Keolis Commuter Services, LLC,
The Massachusetts Bay Transportation Authority,
Nathan Drown,
By Their Attorneys,

_____
Jennifer M. Lee, Esq., BBO# 677949
Bonistalli & Lee
265 Franklin Street, 12th Floor
Boston, MA 02110
617-737-1771
Jennifer.lee@Bonistalli-lee.com

**CERTIFICATE OF SERVICE**

I, Jennifer Lee, attorney for the defendants, Keolis, the MBTA, and Nathan Drown, hereby certify that a true copy of the foregoing document was filed electronically with the Federal Court's electronic filing system on July 31, 2024.

_____
Jennifer M. Lee