UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROSE SHUMOW, as personal representative of the estate of MOSES SHUMOW <br> Plaintiff, <br><br> v. <br><br> KEOLIS COMMUTER SERVICES, LLC., MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, NATHAN DROWN, AND CITY OF BEVERLY, <br><br> Defendants. | Civil Action No. 1:22-cv-11623-MJJ |

## MEMORANDUM OF DECISION

March 31, 2025

JOUN, D.J.

Rose Shumow ("Plaintiff"), as personal representative of the estate of Moses Shumow ("Mr. Shumow"), brings this wrongful death suit against Keolis Commuter Services, LLC. ("Keolis"), Massachusetts Bay Transportation Authority ("MBTA"), Nathan Drown ("Mr. Drown"), and City of Beverly (collectively, "Defendants") after a tragic incident, where Mr. Shumow was fatally struck by a commuter rail train while riding his bicycle across a pedestrian crossing at the Beverly depot station ("Beverly Station"). Specifically, Plaintiff brings claims of negligence against Defendants and claims of gross negligence and willful, wanton, and reckless conduct against Keolis, MBTA, and City of Beverly. Plaintiff contends numerous individuals have been similarly struck by trains in Beverly, the Beverly Station lacked sufficient audible or visual warnings of approaching trains and causes a dangerous condition by allowing pedestrians

to cross in front of oncoming trains, Defendant Mr. Drown, the train operator, failed to properly sound the train horn while speeding, and City of Beverly engaged in deceptive acts regarding the station's "Quiet Zone" status.

On July 31, 2024, the MBTA filed a Motion for Summary Judgment, [Doc. No. 48], as did Keolis and Mr. Drown, [Doc. No. 49], and the City of Beverly, [Doc. No. 53]. On October 2, 2024, Defendants also filed a Motion to Strike certain exhibits filed with Plaintiff's statement of material facts. [Doc. No. 80]. A hearing was held on November 14, 2024. [Doc. No. 90]. For the reasons set forth below, Defendants' Motions for Summary Judgment are GRANTED; the Motions to Strike are GRANTED in part and DENIED in part.

I.  **BACKGROUND**

Mr. Shumow was a 42-year-old tenured professor at Emerson College in Boston. [*Id.* at ¶¶ 11, 14, 15]. Since June 2019, Mr. Shumow had resided in the City of Beverly. [*Id.* at ¶ 14]. He rode his bicycle to Beverly Station and took the commuter rail train to travel to and from Emerson College on most weekdays. [*Id.* at ¶ 15]. Mr. Shumow was killed when struck by a commuter rail train at Beverly Station on October 22, 2019. [Doc. No. 62 at ¶¶ 8, 15]. At the time of the accident, Mr. Shumow was healthy and did not suffer from any disabilities, illnesses, diseases, affliction, physical handicaps, or impairment of his vision or hearing. [*Id.* at ¶ 16].

A.  **The Parties**

The accident took place at Beverly Station, which is in the City of Beverly. [*Id.* at ¶¶ 10, 38]. At all relevant times, the MBTA owned Beverly Station platforms, pedestrian crossings, the train tracks, warnings posted at the station, and the subject commuter rail train. [*Id.* at ¶¶ 3-4]. At all relevant times, pursuant to an agreement with the MBTA, Keolis operated the railed train and maintained the rail's assets. [*Id.* at ¶ 6]. Mr. Drown was employed by Keolis as a locomotive engineer and operated the train at the time of the accident. [*Id.* at ¶¶ 7-8]. At the time of the

accident, Mr. Drown had been employed as a locomotive engineer for over 21 years, approximately five of which were with Keolis. [*Id.* at ¶ 91]. He had operated a train on the Newburyport/Rockport line since January 2011 and through Beverly Station over 8,000 times in his career. [*Id.* at ¶ 92].

### B. Beverly Station and Crossing

Beverly Station is an outdoor commuter rail station. [*Id.* at ¶ 17]. In 1985, the MBTA made improvements to Beverly Station on its platforms, pedestrian crossings, and fencing. [*Id.* at ¶ 35]. At the time of the accident, the station had two tracks which served the Newburyport/Rockport lines of the MBTA commuter rail network. [*Id.* at ¶ 19]. Track 1 generally serviced the outbound trains and track 2 generally served the inbound trains to Boston. [*Id.*]. There was a parking lot next to each track's platform, which was constructed on or about 2014. [*Id.*] [Doc. No. 50-8 at 8] [Doc. No. 81 at ¶ 204].

Intertrack fencing runs between the two tracks to the ends of the station platforms. [Doc. No. 62 at ¶ 22]. There were three cut-outs in the fencing and grade-level walkways that allowed pedestrians to cross the two railroad tracks. [*Id.* at ¶ 22; Doc. No. 81 at ¶ 128]. Mr. Shumow was struck at the southernmost crossing on track 1. [Doc. No. 81 at ¶ 128].

At the time of the accident, Beverly Station had a yellow tactile strip that ran along the inner edge of each platform, a yellow marking visible on track 1 pavement that read "STAND BACK," bright yellow bollards or posts between the parking lot from the platform, and a yellow sign affixed to the northbound intertrack fencing with the words "LOOK BEFORE CROSSING." [Doc. No. 62 at ¶ 21]. Whether Mr. Shumow would have encountered the signage is disputed. [*Id.* at ¶¶ 21-23]. The crossings at Beverly Station did not have flashing lights, audible alerts, crossing gates, crossbuck signs, stop or yield signs. [Doc. No. 62 at ¶ 129; Doc. No. 81 at ¶ 129].

### C. The Accident

On the date of the accident, Mr. Shumow rode his bicycle to Beverly Station to take the inbound train to Boston at about 8:15 AM. [Doc. No. 62 at ¶ 38]. He was wearing earbuds. [*Id.*]. The accident was captured on the train's cameras. [*Id.* at ¶ 39].

At 08:17:34,[1] the train approached the station with its bells activated on the outbound track. [*Id.* at ¶ 42; Doc. No. 50-5; Doc. No. 62-25]. Five pedestrians and one dog walked over the grade crossing from the track 1 side to the track 2 side 10.93 seconds before impact. [Doc. No. 50-5; Doc. No. 62-25; Doc. No. 62 at ¶ 43; Doc. No. 81 at ¶ 134]. The train engineer did not sound the horn when the group crossed the tracks. [Doc. No. 50-5; Doc. No. 62-25; Doc. No. 81 at ¶ 137].

Mr. Shumow cut through the parking lot and, at 08:17:40, entered the outbound platform. [Doc. No. 50-5; Doc. No. 62-25; Doc. No. 81 at ¶ 142]. He immediately turned right, parallel to the train tracks at 08:17:41, with his back to the train. [*Id.*]. Mr. Drown observed Mr. Shumow on a bicycle traveling parallel to and in the same direction as the train. [Doc. No. 50-5; Doc. No. 62-25; Doc. No. 62 at ¶ 96]. Mr. Shumow quickly glanced towards the train, [Doc. No. 50-5; Doc. No. 62-25; Doc. No. 62 at ¶ 145], and at 08:17:42, suddenly began leaning left and turned his bicycle into the tracks to cross it. [Doc. No. 50-5; Doc. No. 62-25; Doc. No. 81 at ¶ 144]. The train makes impact with Mr. Shumow at 08:17:44. [Doc. No. 50-5; Doc. No. 62-25]. The train's horn was sounded 135 feet and 2.7 seconds before impact. [Doc. No. 50-5; Doc. No. 62-25] [Doc. No. 62 at ¶¶ 146, 147]. Upon collision, Mr. Shumow was knocked off his bicycle and pushed against the intertrack fencing. [Doc. No. 50-5; Doc. No. 62-25; Doc. No. 62 at ¶ 154].

---

[1] The times are taken from the stamped time in the train videos.

An event recorder was located on the locomotive engine. [Doc. No. 62 at ¶ 100]. An event recorder tapes various information taken from the train's engine during its operation, such as: speed of the engine, brake pressure, the use of the horn, the use of the bell, emergency brake application, and throttle use. [*Id.* at ¶ 100]. The event recorder documented the following occurrences leading up to the accident:

1. The train was traveling at 38.2 MPH as it approached the Beverly Station. [*Id.* at ¶ 101].

2. As the train continued to approach and enter the station, the brakes were applied and the train's speed incrementally reduced. [*Id.*].

3. From 8:22:57 to 8:23:30,[2] the train's bells were activated. [*Id.* at ¶ 103]. This commenced 1793 feet before impact. [Doc. No. 81 at ¶ 135].

4. The train's horn sounded from 8:23:27 to 8:23:30. [Doc. No. 62 at ¶ 104].

5. At 8:23:30, the train's emergency brake was applied and the accident occurred. [*Id.* at ¶¶ 101-102]. The train was travelling at 33 MPH. [*Id.* at ¶ 102].

## II. LEGAL STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Generally, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to

---

[2] The times recorded on the event recorder appear to be about five minutes and 46 seconds faster than the times recorded on the train video.

5

support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (internal citations and quotations omitted). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson*, 477 U.S. at 252).

## III.  ANALYSIS

### A.  <u>Negligence Claims</u>

Defendants argue that Mr. Shumow's negligence claims fail as a matter of law because Mr. Shumow was the sole cause of his injuries, and the danger was open and obvious such that a reasonable person in Mr. Shumow's position would not have crossed the tracks.

"Contributory negligence shall not bar recovery in any action by any person or legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the total amount of negligence attributable to the person or persons against whom recovery is sought…" M.G.L. c. 231, § 85. "Accordingly, if [Mr. Shumow] is 'found to be more than fifty percent at fault,' [Plaintiff] may not recover." *Smith v. United States*, No. 19-cv-30145, 2024 WL 4262846 at *17 (D. Mass. Sept. 23, 2024) Defendants bear the burden of proving Mr. Shumow was contributorily negligent to bar recovery, M.G.L. c. 231, § 85, and "[i]t is only in rare instances that this requirement can be said, as matter of law, to have been satisfied." *Joyce v. New York, N. H. & H. R. Co.*, 301 Mass. 361, 363 (1938); *see also Cleveland v. Hasbro, Inc.*, No. 96-1073, 99 F.3d 1128 at *2-4 (1st Cir. 1996) (Unpublished) ("Matters of proximate cause and comparative fault are, as a general rule, for the jury; but the settled exception to the general rule applies when a reasonable jury could

6

reach only one result."). I find that this case is one of those rare instances – Defendants have met their burden of proving that Mr. Shumow breached his duty of care and that his contributory negligence far exceeds fifty-one percent to bar recovery. I base my determination largely on video evidence of the accident and undisputed facts presented by the parties. *O'Brien v. Town of Bellingham*, 943 F.3d 514, 531 (1st Cir. 2019). ("[W]hen the record contains video evidence, the authenticity of which is not challenged, the court should ordinarily view the facts 'in the light depicted by the video evidence.'"). Here, "[t]here are no allegations or indications that th[ese] videotape[s] w[ere] doctored or altered in any way, nor any contention that what [they] depict[] differ[] from what actually happened." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The videos show Mr. Shumow entering the Beverly Station platform on his bicycle, turn right briefly perpendicular to the approaching train with its bells ringing, before quickly glancing towards the train, and ignoring the train's horn, lean left and turn his bicycle into the path of the oncoming train. From Mr. Shumow's entry to impact, the timeframe is approximately three seconds. A jury can come to only one conclusion: Mr. Shumow was aware of the train and attempted to beat it to get across to the other side. "A railroad crossing is universally recognized as a place of danger and a person approaching one is bound to exercise ordinary care and prudence for his safety. Generally he must look and listen in such a manner as will enable him to see or hear an approaching train if one is within the range of his sight or hearing…" *Rice v. Bos. & M.R.R.*, 327 Mass. 479, 482 (1951) (cleaned up). Here, the accident took place at about 8:15 AM at Beverly Station. The platform and pedestrian crossing were clearly visible. Mr. Shumow was familiar with Beverly Station as he had commuted most weekdays to and from this station. The videos depict the train with its bells activated and Mr. Shumow hastening to the crossing on his bicycle in a timeframe of approximately three seconds; they clearly show that Mr. Shumow did not listen, stop, and took only a split-second glance before turning into the path of the

oncoming train as he "took the chance of crossing the track before the train could reach him." *N. Pac. R. Co. v. Freeman*, 174 U.S. 379, 384 (1899) (observing that "[t]he duty of a person approaching a railway crossing, whether driving or on foot, to look and listen before crossing the track" was "elementary."). No reasonable jury can conclude that Mr. Shumow did not know that a train was fast approaching; it can reach only one result: Mr. Shumow failed to take reasonable precaution at a recognized place of danger.[3] As in *Freeman*, there were no "obstructions interfering with the view of approaching trains, confusion caused by trains approaching simultaneously from opposite directions, or other peculiar circumstances tending to mislead the injured party as to the existence of danger in crossing the track." 174 U.S. at 384. Thus, any recovery sought by Plaintiff must be barred in whole. *See id.* ("contributory negligence on the part of the deceased was so conclusive that nothing remained for the jury").

Plaintiff argues Defendants failed to follow M.G.L. c. 160, § 138, which required a train to sound its whistle at least 1,320 feet before a public grade crossing and to continue sounding it until the engine had traversed such crossing. Plaintiff also points to M.G.L. c. 160 § 138A to show that the MBTA was required to install an audible or visible warning device at the pedestrian crossing. Here, an extra audible or visible warning device or a longer whistle would not have made a difference. *See Freeman*, 174 U.S. at 383 (cleaned up) ("Any potential "[n]egligence … in these particulars [failure to whistle, or ring the bell] was no excuse for negligence on [deceased's] part."). Even assuming these statutes are applicable to Defendants, no reasonable jury can find from the facts of this case that Mr. Shumow was less than fifty-one percent at fault.

---

[3] To the extent that that an inference can be made that Mr. Shumow did not know that a train was approaching because it is unclear from the videos that he actually saw the train or that he did not hear it because he had on ear buds, Mr. Shumow's negligence is patently clear either way. *See also Joyce*, 301 Mass. at 365 (finding plaintiff was contributorily negligent in similar circumstances).

B.   **Defendants' Motions to Strike**

Before I move on to consider Plaintiff's remaining claims, I must first address Defendants' Motion to Strike/Preclude Evidence. Regarding Exhibits 45, 46, 54, 55, 63, 70, 82 and 83, offered to show prior accident history at Beverly Station, Defendants argue Plaintiff offers no foundation as to whether prior incidents occurred "under circumstances substantially similar to those at issue in the case at bar." *Moulton v. Rival Co.*, 116 F.3d 22, 26–27 (1st Cir. 1997). Plaintiff counters that the inclusion of evidence of prior accidents and close calls at Beverly Station and other grade station crossings is relevant to show Defendants' awareness of the inherent dangers posed at pedestrian grade crossings, particularly Beverly Station. I agree with Plaintiff and DENY Defendants' motion but allow inclusion only to the extent the exhibits demonstrate Defendants' knowledge of prior accidents or incidents relating to Beverly Station.

Defendants also move to strike Exhibits 41, 42, 43, 47, 48, 50, 51, 52, and 79 pursuant to Fed. R. Evid. 402, asserting that the exhibits concern warning requirements which are irrelevant because they do not apply to Beverly Station and/or do not mandate warning requirements. Plaintiff argues the exhibits are relevant, particularly the MBTA Commuter Rail Design Standards Manual, Exhibit 41, and Exhibits 42, 50, because they apply to Beverly Station and constitute admissible evidence of the MBTA's guidelines regarding station safety. I DENY the motion pertaining to Exhibits 41, 42, 47, 48, 50 for purposes of summary judgment. I evaluate their relevance in further detail in Section III(C) below. I ALLOW the Motion to Strike for the following exhibits: Exhibits 43, which is solely applicable to non-pedestrian crossings, Exhibit 51 and 52, guides which were created pursuant to the American with Disabilities Act and have no application to this action, and Exhibit 79, for similar reasons.

Next, Defendants move to strike post-accident documents, Exhibits 44-46, 56, 63, 67, 85-86, 88, 90, 92, and 93, which Defendants argue are inadmissible pursuant to Fed. R. Evid. 402 and 407. I <u>DENY</u> the motion to the extent the exhibits show prior knowledge but exclude them for all other purposes. I also address the applicability of Exhibit 67 in Section III(C).

Finally, Defendants move to strike out of court statements contained in Exhibits 53, 64, 65, 68, 78, and 83 as hearsay evidence inadmissible pursuant to Fed. R. Evid. 802, lay opinion testimony in Exhibit 71 pursuant to Fed. R. Evid. 602 and Fed. R. Civ. P. 56(c)(4), and expert opinion in Exhibit 75 pursuant to Fed. R. Evid. 703. Because I do not rely on these exhibits to resolve summary judgment, the Defendants' motion is <u>DENIED</u> as moot.

### C. **Plaintiff's Remaining Claims**

"The comparative negligence statute is not applicable to intentional or wil[l]ful, wanton, or reckless conduct." *Boyd v. National R.R. Passenger Corp.*, 446 Mass. 540, 548 n.11 (Mass., 2006). Here, where Plaintiff alleges gross negligence and/or willful, wanton, and reckless conduct, such conduct "'requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.'" *Id.* at 547 (citing Restatement (Second) of Torts, § 500, comment g, at 590 (1965)). Furthermore,

> [t]he mere fact that certain precautions are required by a statute rather than the common law does not of itself make the intentional omission of the statutory precaution reckless indifference to the safety of others. In order that the breach of the statute constitute reckless disregard for the safety of those for whose protection it is enacted, the statute must not only be intentionally violated, but the precautions required must be such that their omission will be recognized as involving a high degree of probability that serious harm will result.

*Id.* at 548 (citing Restatement (Second) of Torts, at § 500 comment e, at 589)). The MBTA, Keolis, and the City of Beverly (the "Remaining Defendants") argue that their conduct, as a

matter of law, did not rise to the level of willful, wanton and reckless conduct. However, Plaintiff argues its claims of recklessness and/or gross negligence arise out of the risk of harm stemming from the Remaining Defendants' failure to comply with state statutes, the national standard of care, their own policies, and their awareness of the risk of harm to pedestrians at Beverly Station like in *Boyd*. I will evaluate whether "on this record, the [P]laintiff has presented sufficient evidence to raise a triable issue of fact whether the [the Remaining D]efendants' conduct was reckless." *Id.* at 549.

Plaintiff's cited Federal Railroad Administration ("FRA") Guidelines and MBTA Design Manual are insufficient by themselves to demonstrate the Remaining Defendants' lacked discretion to choose appropriate safety measures. The MBTA Design Manual, whose use of design standards was required for new installation effective April 19, 1996, does not apply to the design and construction of the Beverly Station, which was built prior to 1996. Importantly, there is nothing in the record to indicate that Beverly Station has undergone renovation on its platforms, tracks, or the stations crossings after 1996, which would make it subject to the MBTA Design Manual. I am not convinced by Plaintiff's argument that the MBTA's production of the MBTA Design Manual in discovery constitutes an "admission" that the manual applied to the Beverly Station nor that the addition of a parking lot near Beverly Station makes it subject to the MBTA Design Manual. Regarding the FRA Guidelines, they "are intended as guidance to railroads," not mandates, and "[i]nclusion of any device identified herein should not, in itself, be considered a requirement for its use." [Doc. No. 50-34 at 2]. As such, the FRA Guidelines and MBTA Design Manual are insufficient by themselves to demonstrate the MBTA lacks discretion to determine safety measures at the Beverly Station. To the extent Plaintiff argues that the Remaining Defendants are subject to M.G.L. c. 160, §§ 138 and 138A, there is no evidence in

the record that Beverly Station's pedestrian crossings are *public* ways to make Remaining Defendants subject to these statutes.[4]

Additionally, the record does not sufficiently show that the Remaining Defendants knew about the inadequacy of its safety measures. Plaintiff identifies certain facts: that the FRA provided regular information and workshops regarding station and pedestrian safety, that the MBTA participated in these workshops and collaborated with the FRA in the Commuter Rail Collision Reduction Committee, that no action was done to enhance pedestrian safety at Beverly Station, and that Beverly Station is one of the twenty most problematic commuter rail stations.[5] In other words, Plaintiff points to a *general* context of conversations to increase pedestrian crossing safety mechanisms by the MBTA. Significantly, Plaintiff does not identify specific requests or complaints directed at the MBTA or any problematic safety measures to put the MBTA on notice. I am also unconvinced that a jury could find that the MBTA had notice or should have known about safety deficiencies where Plaintiff asserts only that an individual was struck by a train in Beverly in 1999, and again in 2004, about 15 and 21 years prior to the accident with Mr. Shumow, where no details regarding the facts and circumstances of those

---

[4] Plaintiff relies on Exhibit 67, [Doc. No. 62-32], an unsigned U.S. DOT Crossing Inventory Form, with a revision date of "11/4/22," to demonstrate that Beverly Station is a public way. However, the language of the form is conflicting as to whether Beverly Station is a private or public way; in fact, it appears to say that the crossing is a private way with public access, see Part I: numbers 17 and 20. "There are specific legal criteria for establishing a 'public way,'…. as not every way open to the public is a 'public way.'" *Barry v. Plan. Bd. of Belchertown*, 96 Mass. App. Ct. 314, 318 (2019). There are no facts from which a jury can find that the crossing at issue was a public way.

[5] In an email to two individuals, one at the DOT and the other at Keolis, Assistant Director of Rail Safety – Commuter Rail states that the twenty commuter rail stations listed in her email "are the top 20 problematic Stations that were identified recently by Keolis Train Engineers." Exhibit 46 [Doc. No. 62-11]. The email is dated April 8, 2020, approximately five months after Mr. Shumow's accident. [*Id.*]. Because the email relates to "Station Safety Signage," it is unclear whether the stations being "problematic" referred to accident occurrences or simply that more signage was needed. *See* [*id.*]. Neither the sender or the recipients of the email were deposed, nor any Keolis train engineers.

incidents are available. Finally, generalized statements from Mark Layman, a retired Amtrak train engineer and Beverly resident, that Beverly Station's crossings are particularly dangerous and that he has experienced many close calls, without more, do not demonstrate that the MBTA had prior knowledge of deficient safety measures.

Thus, where Plaintiff has not sufficiently shown that the Remaining Defendants were subject to and did violate certain safety statutes and regulations and where Plaintiff has not made a sufficient showing that the Remaining Defendants knew about potential inadequacies of its safety measures, there is no triable issue of material fact as to whether the Remaining Defendants' conduct was reckless. *Contrast Boyd*, 446 Mass. at 553 ("the intersection of multiple factors—the alleged violations of two statutes designed to protect the public from harm (which required the taking of simple precautions to reduce an enormous risk), the extreme danger posed by public grade crossings, the residential character of the neighborhood around the Pine Street crossing, the MBTA's awareness that pedestrians and bicyclists sometimes went around lowered safety gates, and the high risk of death resulting from an accident—… create[d] a triable issue of material fact whether the defendants' conduct was, in fact, reckless.").

## IV.   CONCLUSION

For the above reasons, Defendants' Motions to Strike are GRANTED in part and DENIED in part, Plaintiff's Motion for Summary Judgment is DENIED, and Defendants' Motions for Summary Judgment are GRANTED.

SO ORDERED.

                                          /s/ Myong J. Joun
                                          United States District Judge